# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROY KOGSTAD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11 C 2367 |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| Social Security ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY , District Judge:

Roy Kogstad has sued Michael J. Astrue, Commissioner of Social Security, seeking review of a decision denying Kogstad disability insurance benefits. Both parties have moved for summary judgment. For the reasons stated below, the Court grants Kogstad's motion and denies the Commissioner's.

## Background

Kogstad suffers from diabetes and coronary artery disease and claims that these conditions have prevented him from working since January 1, 2004. Specifically, Kogstad states that he cannot work full-time as an accountant and tax preparer, his profession since graduating from college, because the stress of the job exacerbates his diabetes and coronary artery disease. Before 2004, he worked full-time as a self-employed accountant for several years. In January 2004 and again in August 2004, doctors performed cardiac catheterization on Kogstad and placed stents in his coronary arteries to treat his coronary artery disease. During this time, Kogstad's diabetes also

appeared to be poorly controlled. Dr. Lawrence Dumont, one of Kogstad's physicians, noted in May 2004 that his blood glucose levels could vary widely each day. R. at 315.

In 2004, as a consequence of Kogstad's health problems and, he claims, on the advice of his doctors, he reduced his work schedule. Kogstad continues to work as an accountant but now works from home an average of two hours each day rather than full time in an office. Even with this reduced schedule, Kogstad says, he needs to take frequent breaks to check and manage his blood glucose levels and is often fatigued or has to rest after working for only an hour or two.

When Dr. Dumont saw Kogstad again in October 2005, he noted that Kogstad's glucose levels still varied a lot within each day. *Id.* at 299. In November 2007 and February 2008, however, Dr. Greg Kirschner, another of Kogstad's doctors, wrote that Kogstad's diabetes was very well controlled. *Id.* at 295, 488. Kogstad did not have significant problems with his coronary artery disease between 2004 and the time that he filed a claim for disability benefits in October 2007. Kogstad underwent a twenty-four-hour electrocardiogram (EKG) in November 2006. *Id.* at 281. The results were normal. In March 2008, Kogstad underwent a cardiac stress test, and the results were likewise normal. *Id.* at 423.

Kogstad filed a claim for disability benefits on October 25, 2007. The Social Security Administration denied his claim in March 2008 and denied his request for reconsideration in August 2008. Kogstad sought a hearing before an administrative law judge (ALJ).

The hearing occurred on June 4, 2009. Kogstad testified and described the limitations his conditions placed on him. He stated that fatigue and the stress

associated with the job made it impossible for him to work full-time as an accountant. *Id.* at 29. Even working from home a couple of hours a day could tire him out if he had to talk on the phone with the IRS or a client. *Id.* Many days, he took an hour-long nap in the afternoon to control his stress. *Id.* at 31. Kogstad thought that he might be able to do less stressful work, such as a clerk at a retail store, but noted that he would need frequent breaks to check his glucose levels and to lie down and rest to control his glucose levels. *Id.* at 30–31. Kogstad agreed that his diabetes had been well controlled on average during the past several years but stated that during each day he still experienced unhealthy highs and lows in his blood sugar. *Id.* at 31–32. He stated that he had not been treated for cardiac problems since 2004 but that he did have occasional chest pain associated with stress. *Id.* at 32.

Kogstad also testified about his other daily activities. He stated that he exercised two or three times per week, usually for about twenty-five minutes. *Id.* at 33. The ALJ noted that Kogstad's doctors had told him to exercise five or six times per week. Kogstad said that he did not exercise that much because he did not have enough time and he "just got lazy." *Id.* Kogstad testified that he lived with his parents and helped out by occasionally driving his mother and brother to various locations. *Id.* at 28, 42–43. He did his own laundry and sometimes cooked or washed the dishes. *Id.* at 39. He served as a trustee of his village between 2005 and 2009, attending regular meetings. *Id.* at 41. Kogstad stated, however, that during his service as a trustee he had to take a nine month leave of absence because he could not handle the stress of the job. *Id.*

Susan Entenberg, an impartial vocational expert, also testified. In response to questions by the ALJ, she stated that there were jobs that were either sedentary or

3

required light exertion and did not involve high stress like Kogstad's previous work as an accountant. *Id.* at 46–47. These jobs included cashier, light housekeeping, food preparation, assembler, information clerk, and inspector, all of which were available in the Chicago metropolitan area in large numbers. *Id.* Entenberg also testified, however, that workers in these sorts of jobs typically are not allowed to take unscheduled or unpredictable breaks during the work shift but instead are required to remain at a work station and generally cannot be absent more than one day per month even for medical reasons. *Id.* at 47–48.

The ALJ issued her decision on June 24, 2009. She determined that Kogstad could perform light work, with limited use of ladders, ropes, and scaffolds and no concentrated exposure to pulmonary irritants. *Id.* at 16. She also determined that Kogstad could not work in high stress jobs. *Id.* The ALJ did not find credible Kogstad's claims of severe impairment due to diabetes and coronary artery disease, because she thought the impairment he described was inconsistent with his daily activities and his ability to work at least a few hours a day in his high-stress accounting job. *Id.* at 16–17. She also found it noteworthy that Kogstad had told Dr. Kirschner in May 2009 that he was not feeling tired or fatigued, which she found cast doubt on Kogstad's testimony at the hearing that he was frequently tired and needed to rest every day. *Id.* at 599. The ALJ also found that Kogstad's diabetes and coronary artery disease were well controlled and had not caused him major problems since 2004. *Id.* at 17–18. She acknowledged that Dr. Kirschner reported that Kogstad required frequent unscheduled breaks during the day and would have to be absent from work more than four days a month for medical reasons. *Id.* at 18, 613, 615. The ALJ did not credit this report,

4

however, because she believed it conflicted with Dr. Kirschner's reports that Kogstad's diabetes was well controlled. *Id.* at 18.

The ALJ found that because he could do light work that involved only low or moderate stress, Kogstad could perform "jobs that exist in significant numbers in the national economy" even though he could not perform his past job as an accountant because it involved high stress. *Id.* at 18–19. The ALJ based this determination upon vocational expert Entenberg's testimony. Because the ALJ found there were jobs that Kogstad could perform, she ruled that he was not disabled between January 1, 2004 and the date of her decision.

Kogstad contends that after the ALJ found that he was not disabled, he attempted to work more hours in his home accounting business. Kogstad contends that this resulted in another hospitalization. In September 2009, an ambulance took Kogstad to the hospital after he experienced abdominal pain. Pl. Ex. 1 at 9. The next day, his pain was diagnosed as a urinary tract stone, which he had apparently passed. *Id.* at 15. Kogstad's EKG was also abnormal, however, which led to him receiving another cardiac catheterization and eventually another stent placed in his coronary arteries. *Id.* at 16, 19–23.

In December 2010, Kogstad sought review of the ALJ's decision from the Social Security Administration's Appeals Council. In addition to arguing that the ALJ's decision was wrong, he also presented new evidence of his most recent hospitalization and cardiac treatment. Kogstad argued that this most recent treatment was a result of attempting to work more hours as an accountant and that it demonstrated the extent of his disability. The Appeals Council denied Kogstad's request for review on February 11,

2011.

## Discussion

"Because the Appeals Council declined review, the ALJ's ruling is the final decision of the Commissioner." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Kogstad argues that the Court should overturn the ALJ's decision because the evidence does not support it and that the case should be remanded so that an ALJ can consider his post-hearing evidence. *See* 42 U.S.C. § 405(g).

**A.     Review of the ALJ's decision**

The Court "review[s] the ALJ's factual determinations deferentially and affirm[s] if substantial evidence supported the decision." *Jones*, 623 F.3d at 1160; *accord* 42 U.S.C. § 405(g).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The ALJ is not required to address every piece of evidence or testimony presented, but must provide a logical bridge between the evidence and the conclusions so that we can assess the validity of the agency's ultimate findings and afford the claimant meaningful review.

*Jones*, 623 F.3d at 1160 (internal quotation marks and citations omitted). "The ALJ must rest [her] denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The Court must consider both the evidence that supports the ALJ's decision and the evidence that does not support it. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

To be found disabled, Kogstad "must prove [ ]he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental

6

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004). To assess whether a disability claimant is disabled, "[t]he Commissioner of the Social Security Administration uses a five-step sequential analysis." *Id*.

> Steps one and two are threshold determinations and assess first, whether a claimant is not presently working, and second, whether the complained-of impairment(s) are of the required duration and significantly limited the claimant's ability to work. In step three, evidence demonstrating the claimant's impairments is compared to a list of impairments presumed severe enough to preclude any gainful work. . . . If the claimant is not able to qualify for benefits under step three, the analysis proceeds to steps four and five. The fourth step requires an assessment of whether the claimant's residual functional capacity [RFC] will allow the claimant to pursue her past work. Where the impairment precludes the performance of past work, the claimant's RFC, age, education, and work experience are considered to determine if other work exists that would accommodate the claimant.

*Id.* (citations and footnote omitted); *see* 20 C.F.R. § 404.1520(a)(4).

The ALJ found that Kogstad was not performing substantial gainful activity at the time he applied for disability and that his medical conditions significantly limited his ability to work. R. at 15. The ALJ then determined that Kogstad's medical conditions were not among those that lead to a presumption of disability, and Kogstad does not challenge that decision. *Id.* at 15–16.

Instead, Kogstad argues that the ALJ erred in determining that he could perform light work if it involved low or moderate stress, without making any accommodation for his need for frequent unscheduled breaks and several medical absences per month. The ALJ's finding that Kogstad did not need to have frequent breaks or absences is essential to her determination that Kogstad was not disabled, because the only

7

evidence on available jobs provided by the vocational expert indicated that the type of jobs for which Kogstad was otherwise qualified would not tolerate frequent unscheduled breaks or more than one absence per month. *Id.* at 15–16.

Kogstad supported his contention that he would need frequent breaks and absences with his own testimony and statements by Dr. Kirschner. First, Kogstad testified that he fatigued easily, could perform only one discrete task per day, and often had to take immediate action to resolve problems with his blood glucose levels. *Id.* at 29, 31–32, 35, 38–39. When the ALJ specifically asked Kogstad if he would be able to test his glucose levels and respond to any problems during the standard two breaks and a lunch that potential employers would provide him, Kogstad said that he did not think such scheduled breaks would be sufficient. *Id.* at 30–31. He stated:

> Depending on the situation, if I feel like I'm low or I'm starting to shake, you know, then I would need to go and lay down and get some sugars. I mean, that would take 15-ish minutes. And, and that's unpredictable. You know, I don't know, kind of, when that's going to happen. So I think, if I went to an employer and tried to work for them, I couldn't guarantee that I'd be there those eight hours, with the lunch and with the two breaks that they usually allow.

*Id.* Kogstad testified that he could not imagine any job that he could consistently work at for eight hours a day, five days a week, without having more than one or two absences per month. *Id.* at 44–45.

Second, Dr. Kirschner completed a questionnaire that supported Kogstad's description of his limitations. Dr. Kirschner wrote that Kogstad's symptoms included fatigue and hyperglycemic and hypoglycemic attacks. *Id.* at 611. Dr. Kirschner also wrote that Kogstad had difficulties when job stress exacerbated his diabetes and coronary artery disease. *Id.* at 612, 615. Dr. Kirschner concluded that Kogstad would

8

need daily unscheduled breaks of about five minutes, would need to be able to shift at will between standing, sitting, and walking, and would miss more than four days per month due to "bad days." *Id.* at 613, 615.

The ALJ found that Kogstad's testimony was not credible, and she discounted Dr. Kirschner's report because of conflicting information. A "determination of credibility must contain specific reasons for the credibility finding. The finding must be supported by evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (citation omitted). The ALJ found that Kogstad's reported daily activities were inconsistent with his reported need to take frequent breaks and vigilantly monitor his glucose levels. In particular, she stated that Kogstad was able to help his mother by taking her to the doctor and managing her medications; drive his brother to and from work; exercise a few times per week; manage his own finances; and engage in leisure activities such as sending e-mails, attending church, watching television, and going to baseball games. R. at 16–17.

"An ALJ can appropriately consider a claimant's daily activities when assessing his alleged symptoms. However, [the Seventh Circuit] ha[s] cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680. Kogstad's daily activities showed that he could get around and perform mental and light physical tasks. These activities, however, did not require Kogstad to work for anything approaching eight hours with no unscheduled breaks. Further, all of these activities occurred intermittently, and none of them, except possibly driving his

9

mother and brother, involved a set schedule.

The ALJ also noted that Kogstad worked a few hours from home as an accountant. R. at 16. Kogstad testified, however, that he worked on average two hours per day and did not work at all on some days. *Id.* at 28. He also stated that even if he did something no more taxing than talking on the phone with the IRS for an hour, he would be exhausted and unable to work for the rest of the day. *Id.* at 29. Additionally, Kogstad's few hours of work at home allowed him the flexibility to take unscheduled breaks to check and manage his blood glucose levels, something that the jobs the vocational expert discussed would not allow. By itself, the evidence of Kogstad's daily activities and part-time work at home does not amount to substantial evidence supporting the ALJ's decision to reject his testimony about his limitations and conclude that he could work full-time without any unscheduled breaks or absences. *Cf. Berger*, 516 F.3d at 546 (claimant's testimony that he was totally disabled and rendered immobile by back pain was not credible when he worked part-time as a carpenter and did light construction work recreationally).

The ALJ also discounted Dr. Kirschner's report because she believed that other evidence contained conflicting information. Specifically, Dr. Kirschner had stated in various records that Kogstad's diabetes was well controlled. R. at 295, 488. The ALJ stated that the fact that Kogstad's diabetes was well controlled conflicted with Dr. Kirschner's statement that Kogstad would be absent from work more than four days per month. *Id.* at 18. The ALJ did not, however, explain how or why the two statements conflicted. Nor did the ALJ explain why she effectively chose to disregard or discount Dr. Kirschner's concrete statement about absences and instead rely on his more

10

nebulous statement that Kogstad's diabetes was well controlled. Though the ALJ stated that Dr. Kirschner's statement about absences appeared to be tied to Kogstad's previous high-stress work as an accountant, there is nothing in Dr. Kirschner's report to support this. *Id.* The report separately addresses stress and absences, and it does not suggest that absences are a concern only when stress is also a concern. *Id.* at 612, 615.

The only evidence in the record that appears to explain Dr. Kirschner's statement that Kogstad's diabetes is well controlled tends to support the physician's conclusion that Kogstad would need frequent absences. Dr. Kirschner's notes appear to indicate that Kogstad was working hard to control his diabetes, making "detailed home records." *Id.* at 488. Kogstad himself testified that he had to take breaks and rest during the day to control his blood glucose levels and that even though he was "diligent" his glucose levels still could vary unpredictably throughout the day. *Id.* at 30–31. In 2004 and 2005, Dr. Dumont also noted that Kogstad's blood sugar varied widely throughout the day. *Id.* at 299, 315. This all tends to support Dr. Kirschner's conclusion that Kogstad often would have bad days that might require being absent from work.

The ALJ also appears to have discounted Dr. Kirschner's conclusion that Kogstad would require unscheduled breaks every day. Indeed, the ALJ had to do so in order to conclude that Kogstad could work the jobs discussed by the vocational expert that would not tolerate unscheduled breaks. The ALJ's written decision, however, does not specifically disclose her reasoning for rejecting Dr. Kirschner's conclusion. The ALJ suggested that Dr. Kirschner's report as a whole was unpersuasive because of the contradiction between the statement that Kogstad's diabetes was well controlled and

11

the conclusion that he would require more than four absences a month. As discussed above, however, those two statements were not contradictory.

The ALJ also gave "[t]he opinion of the non-examining state agency physician . . . some weight" but did not provide a record citation to indicate exactly what opinion she was considering. *Id.* at 18. There appear to be two state agency physicians' reports in the record. *Id.* at 476–83, 595–97. The first physician's report stated that Kogstad's description of his symptoms was consistent with his medical conditions and with the evidence as a whole. *Id.* at 481. The report also concludes, "info consistent and credible," with no further explanation. *Id.* at 483. The second physician's report is a review of the previous report and affirms it but also states, "Claimant is partially credible with symptoms somewhat more severe than the objective findings." *Id.* at 596–97. Neither report discusses whether Kogstad would require unscheduled breaks or frequent absences. Even giving some weight to these reports, there is nothing to suggest that Kogstad did not need unscheduled breaks and absences as Dr. Kirschner concluded. *See Brown v. Barnhart*, 298 F. Supp. 2d 773, 798–99 (E.D. Wis. 2004) (reversing ALJ's decision when it ignored limitations placed by doctors that included the need for unscheduled rest breaks and more than four absences per month; ALJ cited other medical reports as contrary, but those reports did not address these limitations).

In sum, the Court concludes that the ALJ's decision to reject as incredible Kogstad's testimony that he required unscheduled breaks and frequent absences lacks even "some support in the record." *Berger,* 516 F.3d at 546. Furthermore, the ALJ failed to "minimally articulate . . . her justification for rejecting" Dr. Kirschner's report that stated the same. *Berger,* 516 F.3d at 545. Consequently, the ALJ's finding that

Kogstad could perform available jobs and was not disabled is not supported by substantial evidence, because the only jobs discussed by the vocational expert would not tolerate unscheduled breaks or more than one absence per month. The Court therefore reverses the ALJ's decision.

The Court has the authority to grant disability benefits to Kogstad or remand to the Commissioner for further proceedings. 42 U.S.C. § 405(g). "When an ALJ's decision is not supported by substantial evidence, . . . a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits." *Briscoe*, 425 F.3d at 355. "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Id.* at 356. Because this standard has not been met, the Court remands the case for further proceedings.

**B.   New evidence**

Kogstad also contends that his new evidence is material and requires remand to the Commissioner. *See* 42 U.S.C. § 405. The Court has already concluded that the ALJ's decision must be remanded for further proceedings. Thus, it is unnecessary to consider whether Kogstad's new evidence would merit remand on its own. "Any additional relevant evidence [he] desires to submit, however, should be considered on remand." *Campbell v. Shalala*, 988 F.2d 741, 745 (7th Cir. 1993) (ordering consideration of new evidence on remand for lack of substantial evidence supporting ALJ's decision, even though court concluded in dicta that new evidence would not itself justify remand).

## Conclusion

For the reasons stated above, the Court grants Kogstad's motion for summary judgment [docket no. 18] and denies the Commissioner's [docket no. 24]. The Court dire3cts the Clerk to enter judgment remanding the case to the Commissioner for further proceedings consistent with this decision.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 17, 2012